UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DAVID SWANIGAN,

                    Petitioner,                    Case No. 1:13-cv-94

v.                                                 Honorable Robert J. Jonker

WILLIE SMITH,

                    Respondent.

_____/

## OPINION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted by a jury in the Jackson County Circuit Court of possession with intent to deliver less than fifty grams of cocaine, second offense, MICH. COMP. LAWS § 333.7401(2)(a)(iv); MICH. COMP. LAWS § 333.7413(2). On March 17, 2011, the trial court sentenced Petitioner as a fourth habitual offender, MICH. COMP. LAWS § 769.12, to imprisonment of 46 months to 20 years. In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

I.        Petitioner was convicted based on evidence seized in violation of the Fourth Amendment.

II.       The trial court improperly denied Petitioner's motion to exclude evidence that was not relevant, that lacked a proper foundation, and that was more prejudicial than probative.

III.      Petitioner was not given effective assistance of counsel because counsel did not move for a mistrial or ask for an instruction requiring the jury to disregard expert testimony that the manner in which three untested bags of suspected cocaine were packaged was evidence of intent to deliver.

(Pet., ECF No. 1, Page.ID6-9.)  Respondent has filed an answer to the petition (ECF No. 6) stating

that the grounds should be denied.  Upon review of the pleadings and the record, the Court will deny

the petition for failure to raise a meritorious federal claim.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from a traffic stop in Jackson County that resulted in the

seizure of powder and crack cocaine from the trunk of the car that Petitioner was driving.  A small

amount of marijuana also was found in one of Petitioner's shoes.   Following a preliminary

examination on September 13, 2010, Petitioner was bound over on one charge of possession with

intent to deliver less then 50 grams of cocaine, second offense, and one count of possession of

marijuana.[1]  A supplemental information was filed charging Petitioner as a habitual offender, fourth

offense.  Petitioner was tried before a jury on January 24 and 25, 2011.[2]

Officer Kyle Ruge of the Columbia Township Police Department testified that he

conducted a traffic stop involving Petitioner on August 29, 2010 at 10:38 p.m.  (Tr. I, 113.)  Ruge

stopped the car because, when making a right turn, Petitioner turned into the second lane of travel.

(Tr. I, 113-14.)  Petitioner was alone in the car.  (Tr. I, 115.)  Petitioner gave Ruge his driver's

license and a rental agreement for the car.  (*Id*.)  Petitioner told Ruge that he had been driving the

car for about a week.  (Tr. I, 116.)  Petitioner also told Ruge that he had come from an address on

Wesley Street and was on his way to an address on Second Street, but Petitioner did not know the

---

[1]The charge for possession of marijuana was later dismissed.

[2]The trial transcripts will be referred to as follows:
Jury Trial Volume I, January 24, 2011 (ECF No. 11) - Tr. I.
July Trial Volume II, January 25, 2011 (ECF No. 12) - Tr. II

exact street numbers of either address. (Tr. I, 118.) Ruge asked Petitioner about an unopened can of beer that was in the center console of the vehicle. (Tr. I, 119.) Ruge went back to his car and confirmed that Petitioner had a valid driver's license. (*Id.*) Based on the facts that Petitioner was not from the area, had a rental car that was not from the area and did not know the exact addresses of where he was coming from or going to, Ruge called a canine unit for backup. (Tr. I, 119-20.) The canine officer Ruge initially called was on a break, so Ruge immediately called another officer. When Officer Morgan arrived about five minutes later, Ruge asked Petitioner to get out of the car and patted him down for weapons. (Tr. I, 121.)

Ruge testified that the canine officer, Officer Scarpino, arrived 12 to 15 minutes after Ruge's initial call. (Tr. I, 122.) Officer Scarpino searched the car with his dog. The dog went around the car three times. Ruge noted that each time the dog got near the trunk of the car, Petitioner began walking toward the trunk and tried to get Ruge's attention by talking to him. (*Id.*) Petitioner objected to the dog walking around the car and said that he wanted to talk to his lawyer. (Tr. I, 123.) After Officer Scarpino notified Ruge that the dog had indicated on the vehicle, they searched the inside of the car. (*Id.*) In the center console, Ruge found a total of a thousand dollars in cash folded over one time in a clear knotted plastic sandwich bag. (Tr. I, 124.) Ruge removed the keys from the ignition and used them to open the trunk, where they found box containing a clear plastic bag with 24 individually wrapped packages of suspected powder cocaine, which was admitted as People's Exhibit No. 2. (*Id.*) Officers Ruge and Scarpino found a second bag containing what appeared to be 25 individually packaged rocks of crack cocaine, which was admitted as People's Exhibit No. 3. (Tr. I, 126.) A third plastic bag held what appeared to be 33 rocks of crack cocaine and a fourth bag contained two chunks of powder cocaine. (Tr. I, 127-30.) Those bags were admitted into evidence

as People's Exhibits Nos. 4 and 5, respectively. (Tr. I, 127-130.) There also was a suitcase in the trunk that contained a digital scale and papers that had Petitioner's name on them. (Tr. I, 129-30.) When Ruge searched Petitioner, he found $450 dollars in his front pocket. (Tr. I, 132.)

Officer Ruge testified that while they were in the process of collecting and documenting the evidence at the scene, Petitioner began to complain of chest pain. (Tr. I, 133.) An ambulance was called and Petitioner was transported to the hospital. Ruge informed Officer Galbreath, who went with Petitioner to the hospital, that he had not searched Petitioner's shoes and socks. (*Id*.) Ruge submitted the evidence at the scene to the Michigan Crime lab for testing. (Tr. I, 134-35.) The items were physically transported to the crime lab by the evidence manager, Kelly Fletcher. (Tr. I, 138.)

Officer Steven Scarpio of the City of Jackson Police Department testified that he has worked with a canine, Zygos, since December 2005. (Tr. I, 158.) Scarpio explained that Zygos is trained as a passive alert dog, meaning that if he finds the odor he is looking for, he sits and looks in the direction that the odor is coming from. (Tr. I, 159-60.) Zygos was trained to find marijuana, heroin, cocaine and methamphetamine and had been involved in 250 to 300 searches for suspected narcotics. (Tr. I, 160.) Scarpio testified that he and Zygos responded to Officer Ruge's call for a search of Petitioner's car. (Tr. I, 162-63.) After circling the car two or three times and sniffing at the seams on the trunk, Zygos sat down and looked at the left rear portion of the car. (Tr. I, 164, 180-82.) Officers Scarpio and Ruge proceeded to search the car. In the trunk, Scarpio observed a large plastic baggie containing a white chunk material, which Scarpio identified as people's Exhibit 2. (Tr. I, 165.) Scarpio also discovered a lock box with paperwork inside, including a paycheck stub

with Petitioner's name on it. (Tr. I, 166-67.) There was nothing illegal inside the lockbox. (Tr. I, 185.)

Officer Scarpio estimated that he had come into contact with cocaine 750 to 1000 times in his 24-year career in law enforcement and had training and experience with drugs packaged for sale versus for personal use. (Tr. I, 168.) Scarpio explained that cocaine and marijuana typically are weighed and placed in small plastic baggies in order to be sold. (*Id*.) He testified that the small baggies of powder cocaine and baggies with single rocks of crack cocaine found in petitioner's trunk were consistent with the sale of drugs. (Tr. I, 168-69.)

Officer Michael Galbreath of the City of Jackson Police Department testified that he went to the scene of the traffic stop initiated by Officer Ruge. (Tr. I, 192.) By the time Galbreath arrived, Petitioner already was in custody and a sizable quantity of narcotics had been found in the trunk of his car. (Tr. I, 193.) Galbreath observed the various bags of cocaine in the trunk. (Tr. I, 194-95.) In his ten years as a police officer, Galbreath had come into contact with cocaine in excess of fifty times and had experience and training in how cocaine was packaged for sale versus personal use. (Tr. I, 196.) Galbreath opined that the bags of cocaine found in Petitioner's car were "clearly packaged for sale." (*Id*.) He provided the following explanation for his conclusion:

> Many reasons. They are separated in different sizes, different quantities and different stages of product. There is powder product separated with individual baggies inside a big bag. There's another big chunk of powder to be broke up for later distribution. Two different bags of the rock crack cocaine. One was a larger bag that had individual bags wrapped individual plastic inside the big bag, again characteristic for common resale. And then the other bag had just individual rocks by themselves, they had not been bagged up or packaged up for again, the way they are packaged for distribution.

(Tr. I, 196-97.)  Galbreath further testified that he rode to the hospital in an ambulance with Petitioner after he complained of chest pains.  (Tr. I, 197-98.)  Petitioner removed his shoes at the hospital.  In one shoe, Galbraith found a plastic baggie of what appeared to be marijuana, and in the other shoe, he found a folded twenty-dollar bill that contained a white powdery substance that appeared to be cocaine.  (Tr. I, 198-200.)

Zygos was brought into the courtroom for a drug sniffing demonstration in front of the jury.  (Tr. I, 216-220.)

Stephanie Tomasic of the Michigan State Police in the Sterling Heights laboratory testified as an expert forensic scientist regarding narcotics analysis.  (Tr. II, 8-10.)  Tomasic received People's Exhibit Nos. 2-5 for analysis, but tested only Exhibit No. 5 for the presence of cocaine. (Tr. II, 12-13.)  Tomasic explained that because all of the substances appeared to be the same and did not exceed 50 grams, it was lab policy to test only one.  (Tr. II, 13, 18-19.)  Tomasic's tests on People's Exhibit No. 5 were positive for cocaine.  (*Id*.)  Tomasic weighed People's Exhibit Nos. 2-4, but did not test them for the presence of cocaine.  (Tr. II, 17.)  She could not give a scientific opinion as to the substances contained in those exhibits and agreed that they could be fake.  (Tr. II, 17-18.)

Following Tomasic's testimony, defense counsel moved to exclude People's Exhibit Nos. 2-4 because they had not been tested for the presence of cocaine.  (Tr. II, 20-29.)  The trial court struck Exhibit Nos. 3 and 4, but denied the motion with regard to Exhibit No. 2, the large bag containing small baggies of powder cocaine, explaining:

> The court is also, in looking at this, taking into account the fact that all these substances were found in the same box.  The crack cocaine, or what is alleged to be crack cocaine, being exhibit number three and four, clearly have a different appearance and appear to have a different texture than the powdered cocaine.  The powdered cocaine seems to be a homogeneous substance.  All found in the same

area. The powdered cocaine, I think should come in, exhibits number two and five. Because it does appear to be a homogeneous substance. The exhibit number two appears as though it could have been individually packaged from the larger chunk that was found in the same box.

(Tr. II, 30.) The court also struck the photographs of the alleged crack cocaine. (Tr. II, 32-33.) At the conclusion of the trial, the jury found Petitioner guilty of possession with intent to deliver less than fifty grams of cocaine. (Tr. II, 63.)

On March 17, 2011, Petitioner was sentenced as a fourth habitual offender to a prison term of forty-six months to fifteen years. (Sentencing Tr., 10, ECF No. 13.)

## B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on September 21, 2011, raised the same three issues as raised in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, ECF No. 16.) By unpublished opinion issued on May 15, 2012, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 5/15/12 Mich. Ct. App. Op. (MCOA Op.), ECF No. 16.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same three claims raised before and rejected by the Michigan Court of Appeals. By order entered November 7, 2012, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., ECF No. 17.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have

appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo*

review.  *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

### I.     Fourth Amendment

In his first ground for habeas relief, Petitioner contends that his conviction for possession of cocaine with the intent to deliver must be reversed as the drug evidence was seized in violation of his Fourth Amendment right against unreasonable searches and seizures.

The Michigan Court of Appeals rejected petitioner's claim, stating:

> Swanigan argues that his conviction for possession of cocaine with the intent to deliver must be reversed as the drug evidence was seized in violation of his Fourth Amendment right against unreasonable searches and seizures.  We disagree.  This issue was raised in the trial court in a pretrial motion to suppress the evidence.  "To the extent a trial court's decision regarding a motion to suppress is based on an

interpretation of the law, appellate review is de novo."[4] A trial court's findings of fact "made in conjunction with a motion to suppress are reviewed for clear error."[5]

The United States and Michigan Constitutions guarantee the right to be free from unreasonable searches and seizures.[6] If evidence is unlawfully seized in violation of this right, it must be excluded from trial.[7] While a routine traffic stop by police officers is a seizure, the traffic stop does not violate a defendant's constitutional protections if it is not unreasonable under the circumstances.[8] A traffic stop made without a warrant does not violate the Fourth Amendment if a police officer has probable cause to believe that a traffic violation or civil infraction has occurred.[9] During a routine traffic stop, police officers may question a vehicle's driver and occupants and may use canines used in drug detection to sniff the vehicle.[10] In *Caballes*, the United States Supreme Court upheld a canine sniff during a traffic stop because such a sniff did not implicate legitimate privacy interests, and because it found that the "duration of the stop . . . was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop."[11] Thus, in order to comply with the Fourth Amendment, an officer who orders a canine sniff during a traffic stop must: (1) have a legal reason to stop the driver; and (2) not unreasonably prolong the duration of the traffic stop.[12]

We find that the traffic stop in this case did not violate the protections afforded by the Fourth Amendment. Ruge had a legal reason to stop Swanigan because of Swanigan's illegal lane use.[13] Additionally, Ruge did not unreasonably prolong the duration of the stop. The canine unit arrived approximately 12 to 15 minutes after the stop was initiated. This is similar to the timing of the traffic stop in *Williams*, which was found to be reasonable. In *Williams* the officer's initial questioning of the defendant and the vehicle's two other occupants lasted between five and eight minutes, and the canine unit arrived approximately three minutes after the initial questioning was completed.[14] Moreover, Ruge's decision to extend the stop and call for the canine unit was not unreasonable given the suspicious circumstances that arose.[15] Here, Ruge suspected that Swanigan might have been involved in drug activity based on his rental car agreement from out of the area, the fact that he was from out-of-town, and that he did not know where he came from or where he was going. Thus, Ruge was justified in extending the duration of the traffic stop to the extent that he did.[16]

Swanigan's contention that his Fourth Amendment rights were violated because Ruge lacked the reasonable suspicion necessary to call for the canine unit must fail. The relevant inquiry is not whether Ruge had a reasonable suspicion of criminal activity, but rather whether he unreasonably prolonged the traffic stop.[17] Accordingly, Swanigan is not entitled to relief.

[4] *People v Zahn*, 234 Mich App 438, 445; 594 NW2d 120 (1999).
[5] *Id*.

- 11 -

[6] US Const, Am IV; Const 1963, art 1, § 11.

[7] *Terry v Ohio*, 392 US 1, 12; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

[8] *Whren v United States*, 517 US 806, 809-810; 116 S Ct 1769; 135 L Ed 2d 89 (1996).

[9] *People v Davis*, 250 Mich App 357, 363; 649 NW2d 94 (2002).

[10] *People v Williams*, 472 Mich 308, 318 n 16; 696 NW2d 636 (2005); *People v Jones*, 279 Mich App 86, 91, 94-95; 755 NW2d 224 (2008); *Illinois v Caballes*, 543 US 405, 407; 125 S Ct 834; 160 L Ed 2d 842 (2005).

[11] *Id*. at 408.

[12] *Id.*; *Williams*, 472 Mich at 318.

[13] *See* MCL 257.642(1).

[14] *Williams*, 472 Mich at 311.

[15] *See id.* at 315 ("[W]hen a traffic stop reveals a new set of circumstances, an officer is justified in extending the detention long enough to resolve the suspicion raised.")

[16] *Id*.

[17] *Id*. at 318 (Where the stop is not unreasonable, "[i]t is unnecessary to consider whether [the officer] had an independent, reasonable, and articulable suspicion that defendant was involved with narcotics . . .").

(MCOA Op. 2-3.)

Petitioner's Fourth Amendment claim is barred by the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976); *see also Queen v. Scroggy*, 99 F.3d 1302, 1332 (6th Cir. 1996) (noting that it is well-settled that *Stone v. Powell* bars Fourth Amendment claims). In *Stone v. Powell*, the Supreme Court held that federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure, as long as the state has given the petitioner a full and fair opportunity to litigate the Fourth Amendment claim. *Id.*; *see also Rashad v. Lafler*, 675 F.3d 564, 570 (6th Cir. 2012).

In order for the rule of *Stone v. Powell* to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim, and the presentation of the claim in the case before the court must not have been frustrated by failure of that mechanism. *See Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir. 1985). If these two inquiries are satisfied, federal habeas review of the Fourth Amendment claim is precluded, even if the federal court deems the

state-court determination of the claim to have been in error. *Id.* at 824; *accord Jennings v. Rees*, 800 F.2d 72 (6th Cir. 1986); *Markham v. Smith*, 10 F. App'x 323, 326 (6th Cir. 2001).

In the present case, Petitioner cannot satisfy either prong of the *Stone v. Powell* standard. First, it is beyond dispute that Michigan has a state procedural mechanism that presents a defendant a full opportunity to raise a Fourth Amendment claim before trial. Even before the United States Supreme Court decided that the federal exclusionary rule applied to state criminal proceedings, the Michigan courts applied the exclusionary rule to the fruits of unconstitutional searches and seizures. *See People v. Margelis*, 186 N.W. 488 (Mich. 1922). After *Mapp v. Ohio*, 367 U.S. 643 (1961), the Michigan courts consistently have acknowledged their duty, under both the federal and state constitutions, to suppress evidence seized in violation of the Fourth Amendment. *See, e.g., People v. David*, 326 N.W.2d 485, 488 (Mich. Ct. App. 1982). Consequently, Michigan affords criminal defendants a vehicle by which to raise Fourth Amendment challenges.

Second, to satisfy the remaining prong of *Stone v. Powell*, Petitioner must allege facts showing that the state corrective mechanism has somehow broken down. *See, e.g., Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987) (habeas review not barred when state appellate court completely ignored Fourth Amendment claim). The Sixth Circuit pointedly has held that the doctrine of *Stone v. Powell* applies, even if the federal court deems the state-court determination of the Fourth Amendment claim to have been in "egregious error." *Gilbert v. Parke*, 763 F.2d at 824 (citing *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982)).

Petitioner has not alleged any facts showing that the state's mechanism has broken down. Rather, it is clear that the Michigan courts gave Petitioner's Fourth Amendment claim full and proper consideration. As indicated by the Michigan Court of Appeals, a pre-trial hearing was

held on Petitioner's motion to suppress. (*See* 12/8/2010 Def.'s Mot. to Suppress Evid. Hr'g Tr, ECF No. 10.) The transcript demonstrates that the trial court fully and thoughtfully considered Petitioner's motion to suppress. The Michigan Court of Appeals reviewed Petitioner's claim on appeal and determined that it lacked merit. Petitioner applied for leave to appeal to the Michigan Supreme Court, which denied his application. Therefore, even if this Court were to disagree with the determination of the Michigan courts, that disagreement would be insufficient to satisfy the second prong of the Sixth Circuit standard. *Gilbert*, 763 F.2d at 824.

Because Petitioner has failed to demonstrate either prong of *Stone v. Powell*, his claim of illegal search and seizure is barred on habeas review.

## II. Admission of Evidence

In Ground II, Petitioner claims that the trial court improperly denied Petitioner's motion to exclude evidence that was not relevant, that lacked a proper foundation, and that was more prejudicial than probative. Specifically, Petitioner challenged the admission of People's Exhibit Nos. 2-4 because they had not been tested for the presence of cocaine. As set forth in the statement of facts, the trial court partially granted Petitioner's motion by excluding People's Exhibit Nos. 3 and 4, but allowed the jury to consider People's Exhibit No. 2 because it also contained powdered cocaine.

The Michigan Court of Appeals concluded that relief was not warranted, stating:

> Next, Swanigan asserts that the trial court erred when it permitted the jury to consider People's exhibit number two, an untested bag that allegedly contained powder cocaine. Swanigan alleges that the trial court lacked the requisite foundation to admit exhibit number two without expert testimony. In the alternative, he argues that under MRE 403, the evidence should have been excluded because its probative value was substantially outweighed by its prejudicial effect. We disagree. We review the trial court's ruling on "evidentiary decisions for an abuse of discretion"[18]

- 14 -

and will not reverse a conviction because of a trial court's evidentiary ruling unless "it is more probable than not that the error was outcome determinative."[19]

Pursuant to a motion by defense counsel, the trial court instructed the jury not to consider what had been admitted as the People's exhibit numbers three and four, two untested bags that allegedly contained crack cocaine. Because the substance in exhibit number two appeared similar to a substance that was confirmed as cocaine by chemical testing, the trial court allowed the jury to consider the evidence. We find that the prosecution established the proper foundation for admitting exhibit number two when it presented testimony from a forensic scientist employed by the Michigan State Police confirming that the substance in exhibit number two appeared similar to the substance that was tested and confirmed to be powder cocaine.[20]

Additionally, under MRE 403, the probative value of the untested substance was not substantially outweighed by the danger of unfair prejudice, as the amount and packaging of the substance in exhibit number two was relevant to Swanigan's intent to distribute the substance.[21] Thus, because the evidence was highly probative, there was less danger that it would be given undue weight by the jury.[22]

Furthermore, even if the trial court erred by permitting the jury to consider exhibit number two, Swanigan is not entitled to relief because he cannot demonstrate prejudice.[23] The evidence presented against Swanigan was sufficient to find his intent to distribute the drugs even without the admission of exhibit number two. A defendant's intent to deliver a controlled substance may be inferred from the amount of the controlled substance and the manner in which it is packaged.[24] Here, the prosecution presented testimony from a police officer who testified that the "chunks" of powder cocaine in the properly admitted exhibit of tested cocaine were meant to be broken up for later distribution. A police officer may, based on his experience in law enforcement, give his personal opinion regarding aspects of the drug trade.[25] Accordingly, even without the admission of exhibit number two, the evidence supported Swanigan's intent to distribute the cocaine.[26] Therefore, Swanigan was not prejudiced by exhibit number two, as its admission did not change the outcome of the case.[27] Thus, relief is not warranted.

[18] *People v Martzke*, 251 Mich App 282, 286; 651 NW2d 490 (2002).
[19] *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999).
[20] *People v Koehler*, 54 Mich App 624, 634; 221 NW2d 398 (1974); *People v Kirchoff*, 74 Mich App 641, 647; 254 NW2d 793 (1977).
[21] *See People v Ray*, 191 Mich App 706, 708-709; 479 NW2d 1 (1991) (the amount of the controlled substance is relevant to the defendant's intent to deliver the substance). *See also People v Williams*, 188 Mich App 54, 57; 469 NW2d 4 (1991) (a jury may infer that the substance found in untested packages is the same as a similar-looking substance that had been tested).
[22] *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998).
[23] *Lukity*, 460 Mich at 495-496.

[24] *People v Fetterley*, 229 Mich App 511, 518; 583 NW2d 199 (1998).
[25] *Ray*, 191 Mich App at 707-708.
[26] *See Fetterley*, 229 Mich App at 518.
[27] *Lukity*, 460 Mich at 495-496.

(MCOA Op. 3-4.)

   The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

   Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met this difficult standard. He fails to cite any Supreme Court

authority for the proposition that the presence of cocaine must be supported by chemical testing, as opposed to circumstantial evidence. In this case, it is undisputed that People's Exhibit 5 tested positive for cocaine. While People's Exhibit 2 was not tested, the jury heard testimony from experienced police officers and an expert forensic scientist that the substance contained in People's Exhibit 2 appeared to be powdered cocaine. As discussed by the Michigan Court of Appeals, the jury also heard from police officers how large amounts of cocaine are divided into smaller quantities for resale. Based upon the evidence, the jury could reasonably conclude the People's Exhibit 2 contained cocaine. Consequently, this Court cannot find that Petitioner was denied a fundamentally fair trial.

### III. Ineffective Assistance of Counsel

In his third ground for relief, Petitioner asserts that his counsel was ineffective when he failed to move for a mistrial or ask for an instruction requiring the jury to disregard expert testimony that the manner in which three untested bags of suspected cocaine were packaged was evidence of intent to deliver.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be

considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also*

*Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions

were hard to attack). The court must determine whether, in light of the circumstances as they existed

at the time of counsel's actions, "the identified acts or omissions were outside the wide range of

professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that

counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error

had no effect on the judgment. *Id.* at 691.

Applying Michigan's equivalent of the *Strickland* standard, the Michigan Court of

Appeals found that Petitioner's counsel did not render constitutionally deficient performance, stating:

> Finally, Swanigan contends that his trial counsel was ineffective for failing to move for a mistrial or an instruction that prohibited the jury from considering how the untested substances in exhibits two, three and four were packaged as evidence of Swanigan's intent to deliver. We disagree. This issue is unpreserved, so "[this Court's] review is limited to errors apparent on the record."[28]
>
> A defendant is denied the effective assistance of counsel if counsel's "performance fell below an objective standard of reasonableness . . . [and] the representation so prejudiced the defendant as to deprive him of a fair trial."[29] Because we determined that Swanigan was not prejudiced by the admission of the untested substance in exhibit two, his claim for ineffective assistance of counsel in that regard lacks merit.[30] Additionally, review of the record reveals that an appropriate instruction was given that the untested substances in exhibits three and four, which were suspected to be crack cocaine, were excluded from evidence. As such, because "jurors are presumed to follow their instructions,"[31] any further request for instruction by defense counsel would have been futile. Trial counsel is not ineffective for failing to raise a meritless argument.[32]

[28] *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).
[29] *People v Pickens*, 446 Mich 298, 309; 521 NW2d 797 (1994).
[30] *Id*.
[31] *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).
[32] *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

(MCOA Op. 5.)[3]

As previously discussed, trial counsel moved for the suppression of People's Exhibit Nos. 2-4, and was successful in having Exhibit Nos. 3 and 4 excluded from evidence, along with the photographs of that evidence. Counsel also requested and received an instruction that the jury was not to consider the two bags of suspected crack cocaine. In addition, counsel informed the jury during closing arguments that they could not consider People's Exhibit Nos. 3 and 4 because they had been excluded by the trial court and further argued that Exhibit No. 2 was "worthless" evidence because it had not been chemically tested. (Tr. II, 42-43.) The fact that counsel did not move for a mistrial or ask for an additional instruction requiring the jury to disregard expert testimony that the manner in which three untested bags of suspected cocaine were packaged was evidence of intent to deliver, did not render counsel's performance ineffective. "[T]he Sixth Amendment guarantees reasonable competence, not perfect litigation." *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004). Moreover, counsel's decision not to move for a mistrial likely was the result of trial strategy as a mistrial would have given the prosecution the opportunity to test all of the drugs before Petitioner was re-tried.

As the Supreme Court recently has observed, while "'[s]urmounting *Strickland*'s high bar is never an easy task,' . . . [e]stablishing that a state court's application was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485 (2010)). Because the standards under both *Strickland* and

    [3]Respondent contends that Petitioner procedurally defaulted his claim by failing to move for an evidentiary hearing on his claim of ineffective assistance of counsel. Where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, Bell v. Cone, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

§ 2254(d) are highly deferential, "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). In those circumstances, "[t]he question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Applying this doubly deferential standard, this Court cannot find that the decision of the Michigan Court of Appeals was an unreasonable application of *Strickland*.

## Conclusion

In light of the foregoing, the Court will deny Petitioner's application because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying

this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

An Order and Judgment consistent with this Opinion will be entered.


Dated:     July 29, 2016          /s/ Robert J. Jonker
                                   ROBERT J. JONKER
                                   CHIEF UNITED STATES DISTRICT JUDGE